# 25-11033

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**UNITED STATES OF AMERICA,**
Plaintiff-Appellee

v.

**ELEAZAR ELOY LARA,**
Defendant-Appellant

On Appeal from the United States District Court
For the Northern District of Texas
Fort Worth Division
District Court No. 4:25-CR-002-O

## APPELLEE'S BRIEF

Ryan Raybould
United States Attorney

Lindsey D. Pryor
Assistant United States Attorney
Texas State Bar No. 24099182
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8822
lindsey.pryor@usdoj.gov

Attorneys for Appellee

# STATEMENT REGARDING ORAL ARGUMENT

Lara raises a single, drug-quantity calculation issue, which is reviewed under the deferential clear-error standard. This issue is governed by settled precedent and is adequately addressed in the parties' briefs. Oral argument is unnecessary and unlikely to benefit the Court.

# TABLE OF CONTENTS

**Page**


STATEMENT REGARDING ORAL ARGUMENT .................................. i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF THE ISSUE ............................................................ 1

STATEMENT OF THE CASE ............................................................ 1

1. Lara agrees to sell ten kilograms of methamphetamine to a confidential source, but he brings two kilograms of cocaine to the sale and is arrested ........................................................ 1

2. Lara pleads guilty to trafficking cocaine and is sentenced to 120 months' imprisonment .......................................................... 4

SUMMARY OF THE ARGUMENT ...................................................... 8

ARGUMENT AND AUTHORITIES ..................................................... 9

The district court did not clearly err in its drug-quantity determination .. 9

A. The district court's factual findings—that Lara was reasonably capable of providing the agreed-upon quantity of methamphetamine, and that the sale was not completed—were more than plausible ............................ 11

B. Any error was harmless ............................................... 20

CONCLUSION ................................................................................ 255

CERTIFICATE OF COMPLIANCE ....................................................... 26

## TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*Puckett v. United States*, 556 U.S. 129 (2009) ........................................... 11, 12

*United States v. Ahmadou*, 159 F.4th 936 (5th Cir. 2025) ................................ 23

*United States v. Coleman*, 609 F.3d 699 (5th Cir. 2010) ................................ 9, 10

*United States v. Coto-Mendoza*, 986 F.3d 583 (5th Cir. 2021) .......................... 23

*United States v. Davis*, 478 F.3d 266 (5th Cir. 2007) ........................... 12, 19, 20

*United States v. Garcia*, 889 F.2d 1454 (5th Cir. 1989) ......................... 14, 15, 17

*United States v. Garcia-Covarrubias*, 427 F. App'x 373 (5th Cir. 2011) ......... 15, 17

*United States v. Harris*, 702 F.3d 226 (5th Cir. 2012) ..................................... 10

*United States v. Harris*, 740 F.3d 956 (5th Cir. 2014) ..................................... 19

*United States v. Hott*, 866 F.3d 618 (5th Cir. 2017) .................................... 22, 23

*United States v. Ibarra-Luna*, 628 F.3d 712 (5th Cir. 2010) ............................. 20

*United States v. Lopez*, 749 F. App'x 273 (5th Cir. 2018) ................................ 10

*United States v. Martinez*, 131 F.4th 294 (5th Cir. 2025) ................................. 21

*United States v. Martinez-Rivera*, 2025 WL 985711 (5th Cir. Apr. 2, 2025) ....... 24

*United States v. Mergerson*, 4 F.3d 337 (5th Cir. 1993) ............................... *passim*

*United States v. Munoz*, 127 F.3d 33, 1997 WL 589200 (5th Cir. 1997) ........... 15

*United States v. Reed*, 2025 WL 2992421 (5th Cir. Nov. 24, 2025) .................. 22

*United States v. Rios*, 584 F. App'x 275 (5th Cir. 2014) ................................. 24

*United States v. Rodriguez-Diaz*, 196 F.3d 1258 (5th Cir. 1999) ....................... 15

**Federal Cases, continued** **Page(s)**

*United States v. Rothenbach*, 198 F.3d 241 (5th Cir. 1999) .............................. 15

*United States v. Sealed Appellant*,
2025 WL 1924524 (5th Cir. July 14, 2025) ........................................ 23, 24

*United States v. Stephens*, 844 F. App'x 723 (5th Cir. 2021) ............................ 21

*United States v. Vine*, 62 F.3d 107 (5th Cir. 1995) .................................... 15, 18

**Federal Statutes**

18 U.S.C. § 3231 ........................................................................... 1

18 U.S.C. § 3742(a) ........................................................................ 1

**United States Sentencing Guidelines**

USSG § 2D1.1, comment. (n.5) .................................................. 11, 12, 18

## STATEMENT OF JURISDICTION

This is a direct appeal from a sentence in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 18 U.S.C. § 3742(a). The district court entered its judgment on September 8, 2025, and Lara timely filed his notice of appeal that same day. (ROA.95, 99.)

## STATEMENT OF THE ISSUE

Did the district clearly err in its drug-quantity determination? And, even assuming error, was any error harmless?

## STATEMENT OF THE CASE

### 1. Lara agrees to sell ten kilograms of methamphetamine to a confidential source, but he brings two kilograms of cocaine to the sale and is arrested.

DEA investigators learned in November 2024 that Lara was seeking a customer base in the Dallas-Fort Worth (DFW) area to buy kilogram-quantities of methamphetamine, and they introduced a confidential source (CS) to him. (Dkt. No. 69-1 at 4 (PSR).)[1] On November 22, 2024, Lara told the CS that he had ten kilograms of cocaine and ten kilograms of methamphetamine available for immediate purchase. (PSR at 4.) The CS

[1] "Dkt. No. at __" refers to the docket number in the underlying criminal case and the page number file-stamped across the top of the page. The government will refer to the presentence report as "PSR" herein for ease of reference.

negotiated the purchase of methamphetamine and cocaine at the direction of DEA agents. (PSR at 4.) Lara told the CS that the "Boss" would not let him deliver the drugs without an upfront payment or meeting the buyer first. (PSR at 4.) Lara gave the CS a phone number for the "Boss" and told the CS he could contact the "Boss" directly. (PSR at 4.)

On December 8, Lara called the CS and told him he was on his way to DFW from San Antonio with ten kilograms of methamphetamine. (PSR at 4.) They agreed on a sale price of $24,000 and a specific meetup location in Lake Worth, Texas. (PSR at 4.) Later that day, Lara arrived at the meetup spot and called the CS. (PSR at 4.) Lara said he did not have the ten kilograms of methamphetamine, but he suggested that they go to a location in Dallas and meet with his source of supply (SOS), "El Bueno," to obtain the drugs. (PSR at 4.) DEA agents directed the CS to decline. (PSR at 4.)

The next day, December 9, Lara contacted the CS and said he had found an alternate SOS in San Antonio and obtained ten kilograms of methamphetamine, and they agreed to meet at the same location in Lake Worth. (PSR at 4.) At the appointed time, investigators set up surveillance at the location and saw Lara arrive in a truck with another man, Jorge Martinez. (PSR at 4.) Lara and Martinez got out and met the CS at the rear of the truck. (PSR at 4.) They told the CS that they did not have the methamphetamine but

did have two kilograms of cocaine as a substitute. (PSR at 4.) They took out a brick-like package and, after confirming that it was cocaine, the CS told Lara and Martinez he was going to get the money and departed. (PSR at 4-5.)

At that point, Lake Worth police approached to execute an arrest. (PSR at 5.) Martinez, who was driving the truck, accelerated through the parking lot and led police on a high-speed chase through residential and commercial areas. (PSR at 5.) After running a red light in downtown Fort Worth and colliding into another vehicle,[2] Martinez and Lara got out of the truck and fled on foot. (PSR at 5.) They were ultimately apprehended, and officers searched the vehicle and discovered: 2,370 grams of cocaine, a loaded firearm in the front passenger's door, and three phones. (PSR at 5.)

DEA agents analyzed the contents of Lara's phone. (PSR at 5.) That analysis revealed "several conversations between Lara and multiple [sources of supply] and distributors, which identified Lara as a facilitator in the transportation and distribution of kilogram quantities of controlled substances" throughout Texas. (PSR at 5.) Agents concluded that Lara routinely contacted suppliers on behalf of customers and appeared to collect a broker's fee for completed drug transactions. (PSR at 5.)

---

[2] The woman who was driving the car they crashed into had moderate head, shoulder, and neck injuries. (PSR at 5.)

### 2. Lara pleads guilty to trafficking cocaine and is sentenced to 120 months' imprisonment.

Lara and Martinez were named in a single-count indictment with conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846 (21 U.S.C. §§ 841(a)(1) and (b)(1)(B)), which carried a statutory punishment range of five to 40 years. (ROA.19-21.) Through counsel, Lara negotiated a deal whereby he agreed to plead guilty to a superseding information charging him with one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846 (21 U.S.C. §§ 841(a)(1) and (b)(1)(C)), reducing his sentencing exposure to a maximum of 20 years. (ROA.52-53, 57-58.) Lara did not have a written plea agreement. (*See* ROA.195.) The district court accepted Lara's guilty plea. (ROA.240-41.)

Prior to sentencing, probation prepared Lara's presentence report (PSR). The PSR noted that, pursuant to Application Note 5 of USSG § 2D1.1, "in an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense, or the defendant establishes that he did not intend to provide or purchase, or was not reasonably capable of providing or purchasing" that agreed-upon quantity. (PSR at 5.) The PSR explained that

Lara agreed to sell the CS ten kilograms of methamphetamine and, "from previous conversations, he had the capability of obtaining" that amount. (PSR at 5-6.) Accordingly, the PSR held Lara accountable for ten kilograms of methamphetamine and 2,370 grams of cocaine, resulting in a total converted drug weight of 20,474 kilograms and a base offense level of 34. (PSR at 6-7.) After adding two levels for possession of a firearm and two levels because Lara fled from law enforcement; and subtracting three levels for acceptance of responsibility, Lara's total offense level was 35. (PSR at 7-8.) With a criminal-history category of II, Lara's advisory guidelines range was 188 to 235 months' imprisonment. (PSR at 17.)[3]

Lara filed written objections to the PSR. (Dkt. No. 82.) Relevant here, he objected to the PSR's inclusion of ten kilograms of methamphetamine in the drug-quantity calculation, arguing that there was insufficient evidence that he was capable of acquiring that amount. (Dkt. No. 82 at 2-3.) In support, Lara cited a recorded call that had been available "in-house" at the U.S. Attorney's

[3] Lara's counsel had previously sought to withdraw on the eve of trial. (ROA.128.) At a hearing on that motion (which was ultimately denied), counsel explained that one of Lara's complaints with her representation was with how she had estimated his potential guidelines range. (ROA.132.) She had told Lara that, when the PSR calculated the drug quantity, the range could be as high as 188 to 235 months based on the methamphetamine he agreed to sell. (ROA.136-37, 146-47.) Accordingly—beyond the fact that Lara pled guilty after confirming under oath that he understood that the guidelines range would not be determined until sentencing and that the district court could sentence him up to the 20-year statutory maximum, (ROA.179-80)—the 188-to-235 range ultimately determined at sentencing was consistent with his counsel's earlier estimate.

Office wherein the CS purportedly relayed to the DEA that Lara was unable to obtain a large quantity of methamphetamine. (Dkt. No. 82 at 3.)

The PSR Addendum rejected Lara's drug-quantity objection. (Dkt. No. 85-1 at 2.) It explained that Lara had negotiated the sale of ten kilograms of methamphetamine on two separate days and represented he had that amount ready for sale, but that he had ultimately terminated those transactions due to issues with his SOS. (Dkt. No. 85-1 at 2.) Then, on December 9, Lara contacted the CS again and said he had located an alternate SOS and could provide the negotiated amount. (Dkt. No. 85-1 at 2.) The Addendum reiterated that, although Lara was only found in possession of 2,370 grams of cocaine, he had "the connections and capabilities of obtaining 10 kilograms of methamphetamine based on prior agreed upon transactions with the CS"; and "an analysis of [Lara's] phone identified him as a facilitator in the transportation and distribution of kilogram quantities of controlled substances through conversations with multiple SOS[s] and distributors which further solidif[ies] his ability to obtain them." (Dkt. No. 85-1 at 2.)

At Lara's sentencing hearing, the district court heard additional argument on the drug-quantity objection. (ROA.255-56.) Lara's counsel reiterated that there was insufficient evidence that Lara was capable of obtaining ten kilograms of methamphetamine. (ROA.255-56.) Instead, Lara

insisted, the government had artificially inflated the amount of drugs because it was the CS who kept insisting that Lara should sell him that amount, and Lara—despite trying to obtain it—clearly did not have the ability to do so because, "three weeks into [these attempted sales] and we still don't have any of these narcotics." (ROA.255-56.) The government, in turn, emphasized that Lara's phone showed that Lara was negotiating with drug suppliers to obtain larger quantities of drugs. (ROA.262.)

The district court overruled Lara's objection, finding that "the PSR generally shows this, particularly paragraph 10 and paragraph 18, show that the defendant was responsible and intended as part of the conspiracy in this case to deliver the 10 kilograms." (ROA.263.) After overruling Lara's other objections, the court adopted the guidelines calculations in the PSR. (ROA.263-64.)

The court ultimately imposed a downward-variant sentence of 120 months' imprisonment. (ROA.269-70.) The court explained: "This is a downward variance based on the arguments made by counsel. After considering her arguments, after considering the facts of this case, as well as the defendant's criminal history, setting aside what the guidelines actually do, I've consulted with them, but setting aside what they actually do, this is the sentence I would—I impose pursuant to the consideration[s] set forth in

Section 3553." (ROA.269-70.) Then, in a written statement of reasons, the court reiterated: "In determining this sentence, the Court considered the advisory guidelines, as well as statutory concerns listed in 18 U.S.C. § 3553(a). This sentence is sufficient, but not greater than necessary, to achieve the Court's sentencing objectives of punishment, deterrence, and protection of the public. Even if the guideline calculations are not correct, this is the sentence the Court would otherwise impose under 18 U.S.C. § 3553." (Dkt. No. 92 at 4.)

## SUMMARY OF THE ARGUMENT

Lara challenges the district court's factual finding that he was reasonably capable of providing the ten kilograms of methamphetamine he agreed to sell. He also says that, because Lara and his codefendant only brought two kilograms of cocaine to the transaction, the district court clearly erred by not finding that the "sale [was] completed and the amount delivered more accurately reflect[ed] the scale of the offense." However, it is undisputed that Lara intended to sell ten kilograms of methamphetamine to the CS, and the unrebutted evidence shows that Lara was a facilitator in the distribution of kilogram-quantities of controlled substances. On this record, the district court's finding that the sale was not completed and that Lara was reasonably capable of providing the ten kilograms of methamphetamine he agreed to sell

was more than plausible. This Court has routinely affirmed in similar cases, and it should do likewise here.

Additionally, even assuming error in the district court's drug-quantity finding, any error was harmless. The district court imposed a 120-month sentence, which was a downward variance from the 188-to-235 guidelines range. It provided clear reasons for the downward variance and stated that it believed the sentence was appropriate under the Section 3553(a) factors, even "setting aside" the guidelines. Then, in a written statement of reasons, the court explicitly stated that, even if its guidelines calculations were incorrect, it would have imposed the same 120-month sentence. Lara raises a laundry list of complaints about this Court's reliance on the written statement of reasons in the harmlessness analysis, but none are persuasive. The Court should affirm.

## ARGUMENT AND AUTHORITIES

### The district court did not clearly err in its drug-quantity determination.

### Standard of Review

Because Lara argued below that he was incapable of providing ten kilograms of methamphetamine, he preserved that argument. This Court reviews the district court's application of the guidelines de novo and its factual findings for clear error. *United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010); *United States v. Mergerson*, 4 F.3d 337, 345 (5th Cir. 1993) (reviewing the

district court's drug-quantity finding for clear error). "Generally, a PSR bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (internal quotation marks omitted). A district court may therefore adopt facts in a PSR "without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *Id.* (internal quotation marks omitted). And "[a] factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *Coleman*, 609 F.3d at 708.[4]

Lara also makes a new argument on appeal—that the district court should have held him responsible only for the cocaine he actually possessed because the sale was completed and "no further delivery" of methamphetamine was scheduled. (Brief at 21-22.) He did not give the district court an opportunity to address that argument below, and the Court should review it for plain error. *See United States v. Lopez*, 749 F. App'x 273,

[4] To avoid this deferential standard of review, Lara argues that review is de novo because no facts are in dispute. (Brief at 17-20.) He is wrong. Lara is challenging the district court's finding that he was reasonably capable of providing ten kilograms of methamphetamine, which is a factual dispute reviewed for clear error. *See, e.g.*, *Mergerson*, 4 F.3d at 346 (reviewing the district court's findings that the defendant had the intent and ability to provide the negotiated amount of drugs for clear error).

276 (5th Cir. 2018) ("Because he did not object to the drug quantity on this ground in the district court, we review for plain error."). Under that standard, Lara must show: (1) the district court erred; (2) the error was clear or obvious, rather than subject to reasonable dispute; and (3) the error affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he meets these requirements, this Court "has the discretion to remedy the error," which it will exercise only if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up). In any event, however, because all of his arguments challenging the district court's drug-quantity determination easily fail under the clear-error standard, the government presumes that it was preserved.

## Discussion

### A. The district court's factual findings—that Lara was reasonably capable of providing the agreed-upon quantity of methamphetamine, and that the sale was not completed—were more than plausible.

In a case involving an agreement to sell a controlled substance, the default rule is that the district court should use "the agreed-upon quantity of the controlled substance . . . to determine the offense level." USSG § 2D1.1, comment. (n.5). Application Note 5 to Section 2D1.1 provides a few exceptions, however. First, it says that "the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale

is completed and the amount delivered more accurately reflects the scale of the offense." USSG § 2D1.1, comment. (n.5). It gives one "example": if a defendant "agrees to sell 500 grams of cocaine" and the transaction is completed by the delivery of cocaine, but the actual amount is only 480 grams "and no further delivery is scheduled," the amount delivered more accurately reflects the scale of the offense. *Id.*

Second, if the defendant establishes that he "did not intend to provide" or "was not reasonably capable of providing" the agreed-upon quantity of the controlled substance, the court should exclude that amount from the drug-quantity calculation. *Id.* The defendant has the burden of persuasion to show that he lacked the necessary intent or capability to provide the agreed-upon amount of drugs. *United States v. Davis*, 478 F.3d 266, 272 (5th Cir. 2007).

Accordingly, the district court (implicitly and explicitly) made several factual determinations here: (1) the sale of methamphetamine was not completed; and (2) Lara failed to establish either (a) that he did not intend to deliver ten kilograms of methamphetamine, or (b) that he was not reasonably capable of providing that amount. (*See* ROA.263.) Lara does not dispute the court's finding that he intended to deliver ten kilograms of methamphetamine. (Brief at 25 ("The district court plausibly concluded that Mr. Lara *intended* to complete the transaction.").) Rather, he challenges only the court's findings

that the sale was not completed and that he was reasonably capable of providing ten kilograms of methamphetamine. But these findings were more than plausible in light of the record as a whole.

As an initial matter, this Court has consistently found that a defendant's failure to provide the agreed-upon quantity of drugs at the time of sale does not disprove his ability to do so in the future. In *Mergerson*, for example, the defendant agreed to sell one kilogram of heroin to an undercover agent and negotiated the price. 4 F.3d at 340. Later, the defendant called the agent to say he could only acquire 350 grams, and he delivered only 334.8 grams at the time of the transaction. *Id.* When undercover agents asked why he did not bring the whole kilogram, the defendant said that he was not the one in the drug-trafficking operation who controlled the heroin, but that he would get the remainder soon—he just could not do so immediately because "his man" was "out of town." *Id.* On appeal, this Court rejected the defendant's argument that his statements about being able to provide a kilogram of heroin were simply "puffing," noting that the defendant's "prior deliveries and promises for future deliveries, when taken in conjunction with the narcotics transactions

notes found at" his codefendant's apartment, demonstrated that the district court's drug-quantity finding was not clearly erroneous. *Id.* at 346.

Similarly, in *United States v. Garcia*, this Court affirmed the district court's finding that the defendant should be held accountable for the agreed-upon amount of cocaine (16 ounces) instead of what he actually delivered (8 ounces). 889 F.2d 1454, 1455 (5th Cir. 1989). There, the defendant had told an undercover DEA agent that "his source was out of 'stuff,' but would get more, and was expected to arrive with the cocaine the following evening." *Id.* The agent said he would take 16 ounces, and they negotiated a price. *Id.* The next day, the defendant said that his source was back in town but only had 8 ounces. *Id.* When the defendant met the agent and sold 8 ounces of cocaine, he was immediately arrested. *Id.* On appeal, this Court affirmed the district court's decision holding the defendant accountable for the agreed-upon 16 ounces. *Id.* at 1456. The Court noted that the defendant had "represented that he could deliver sixteen ounces," and "negotiated with an undercover DEA agent for the sale" of that amount, and the district court "implicitly found that this was not mere 'puffing' because it found as a fact, after hearing testimony and the arguments of counsel," that the defendant was reasonably capable of

producing the negotiated amount. *Id.* at 1456-57. And that factual finding was not clearly erroneous in light of the record as a whole. *Id.*

Other cases are in accord. *See, e.g.*, *United States v. Vine*, 62 F.3d 107, 110 (5th Cir. 1995) ("The fact that Vine failed in supplying the chemicals necessary to produce 12 pounds [of methamphetamine] is not evidence that Vine did not intend to supply the needed chemicals or that he would not be able to do so in the future."); *United States v. Garcia-Covarrubias*, 427 F. App'x 373, 376 (5th Cir. 2011) (affirming the drug-quantity calculation for the negotiated amount based on unrebutted evidence in the PSR suggesting that the defendant could obtain that quantity); *United States v. Rothenbach*, 198 F.3d 241, 1999 WL 824513, at *5 (5th Cir. 1999) (unpublished) (noting that the inability of officers to recover the agreed-upon amount of drugs did not "compel the conclusion" that the appellants were incapable of providing that amount); *United States v. Rodriguez-Diaz*, 196 F.3d 1258, 1999 WL 800235, at *1-2 (5th Cir. 1999) (unpublished) (noting that it was "proper to consider whether negotiations for a drug deal were sufficiently specific as to logistical concerns such as price, quantity, and delivery" (internal quotation marks omitted)); *United States v. Munoz*, 127 F.3d 33, 1997 WL 589200, at *1 (5th Cir. 1997) (unpublished) (rejecting the defendant's argument that he should only be held accountable for the 146

pounds of drugs he delivered, because his statements that he could obtain 1,000 pounds were mere "puffery").

These cases confirm that the district court did not clearly err in finding that Lara was reasonably capable of providing ten kilograms of methamphetamine. The unrebutted evidence in the PSR showed that: (1) Lara represented on three occasions that he could provide ten kilograms of methamphetamine and agreed on a price with the CS; (2) Lara represented to the CS that he had more than one SOS, even giving the CS a phone number for a supplier named the "Boss"; (3) Lara traveled to DFW twice from San Antonio to meet with the CS; and (4) when Lara was unable to provide ten kilograms of methamphetamine on December 8, he offered to travel with the CS to a location in Dallas to meet with a supplier named "El Bueno" to obtain the drugs. (PSR at 4-5.) Moreover, an extraction of Lara's phone revealed text conversations with multiple sources of supply and distributors, identifying him as a facilitator in the distribution of kilogram-quantities of controlled substances. (PSR at 5.) Although agents could not determine specific drug quantities from any of these conversations (and thus Lara's drug quantity did

not increase based on any of these messages), the fact that he was negotiating with multiple SOSs for large quantities of controlled substances and appeared to collect a broker's fee demonstrated that Lara had connections and capability to deliver ten kilograms of methamphetamine. (PSR at 5; *see also* ROA.156-57, 262.)

Lara did not rebut any of this evidence at sentencing. Instead, he argued only that it was clear from his inability to deliver ten kilograms of methamphetamine by December 9 that he was not capable of providing that amount. (Dkt. No. 82.) Although he pointed to a phone call where the CS purportedly relayed to the DEA agent that Lara could not provide ten kilograms of methamphetamine, Lara did not provide any details about the call. And he did not rebut any of the other information in the PSR, including the conversations from his phone showing that he had the connections to obtain large quantities of drugs. On this record, it was more than plausible for the district court to find that Lara was reasonably capable of providing ten kilograms of methamphetamine, even if he did not actually deliver that amount by December 9. *See, e.g.*, *Garcia*, 889 F.2d at 1456; *Mergerson*, 4 F.3d at 346; *Garcia-Covarrubias*, 427 F. App'x at 373.

On appeal, Lara does not cite any cases to support his argument. Instead, he argues that the *only* possible inference from his inability to deliver

ten kilograms of methamphetamine is that he was not capable of doing so. But as the cases above demonstrate, the fact that a defendant fails to deliver the agreed-upon amount before he is arrested does not negate his intent or capability to do so another time. *See Vine*, 62 F.3d at 110; *Mergerson*, 4 F.3d at 346 n.7 ("Simply because Mergerson was unable to produce the full kilogram [on the day of the sale] does mean that he was not *ultimately* capable of producing it."). And here—given that Lara represented that he could provide ten kilograms of methamphetamine on multiple occasions; he negotiated a price; he had more than one SOS; and his phone conversations showed that he worked with suppliers to move drugs and obtained a broker's fee for doing so—it was certainly not implausible for the district court to find that he was capable of providing the agreed-upon amount.

Lara also points to the first part of the application note and argues that the court should have only held him accountable for two kilograms of cocaine because the "sale was completed" and "no further delivery was scheduled" for the methamphetamine. (Brief at 21-22 (citing USSG § 2D1.1, comment. (n.5).). That argument is misplaced. That language in Note 5 gives an *example* of when "the sale is completed and the amount delivered more accurately reflects the scale of the offense"—it does not require the government to prove that that parties had scheduled a future delivery in order to use the agreed-

upon amount. And here, it was a fair inference that the sale was not completed. Lara had previously agreed to sell—and negotiated the price for—ten kilograms of cocaine *and* ten kilograms of methamphetamine. (PSR at 4.) The court thus implicitly found that the delivery of two kilograms of cocaine did not finalize the transaction, and the amount delivered (two kilograms of cocaine and zero methamphetamine) did not more accurately represent the scale of the offense than the agreed-upon ten kilograms of methamphetamine. Given the ongoing negotiations between Lara and the CS, as well as Lara's repeated statements that he could provide ten kilograms of methamphetamine, it was reasonable to infer that he would provide that amount at a later date.[5]

This Court's decision in *United States v. Davis* provides a useful counterexample. In that case, the PSR included 85.05 grams of crack cocaine that the defendant had agreed to deliver to a confidential informant. 478 F.3d at 269. But in *Davis*, the PSR also concluded that the defendant did not provide those drugs and actually "intended to 'rip off' the confidential informant by selling him 3 ounces of a non-controlled substance in place of

[5] Lara relies on the word "substitute" to argue that the parties understood that there would be no future drug transactions between them—but it is just as plausible to infer that Lara and Martinez brought two kilograms of cocaine as a substitute *that day*, and that Lara would provide the methamphetamine at a later date. *See, e.g.*, *United States v. Harris*, 740 F.3d 956, 967 (5th Cir. 2014) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (internal quotation marks omitted)).

crack cocaine." *Id.* at 272. It was thus an "undisputed finding of fact" that the defendant "did not intend to provide the agreed amount of crack cocaine." *Id.* The Court ultimately vacated the sentence, concluding that, "[s]ince Davis never intended to supply the agreed quantity of a controlled substance, this is not a situation in which the defendant intended to provide a certain amount of controlled substance but was arrested before he could do so." *Id.* Here, by contrast, it is undisputed that Lara *did* intend to provide ten kilograms of methamphetamine. And given that it was at least plausible that he was reasonably capable of providing that amount at a later date, the fact that he did not deliver ten kilograms of methamphetamine by December 9 does not establish that the sale was final.

In sum, the district court's factual findings in support of the drug-quantity determination were at least plausible on this record. The Court should affirm.

### B. Any error was harmless.

Even assuming the district court erred in its drug-quantity finding, any error was harmless. An error is harmless if the government "convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the

same reasons it gave at the prior sentencing." *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010). Here, the evidence shows just that.

At sentencing, the district court varied downward based, in part, on defense counsel's arguments and the "facts of the case." (ROA.269-70.) In her sentencing argument, defense counsel had reiterated her points challenging the drug quantity—that it did not adequately represent Lara's culpability because "the government is the one that chose the quantities" and "kept pressing these quantities" even when Lara kept saying he could not come up with that amount. (ROA.266.) For that reason, defense counsel argued, the court should treat Lara like someone who could "talk a big game" but in reality, was only able to show up with two kilograms of cocaine. (ROA.268.) And counsel asked the court not to "clog the prison with a bunch of ghost dope and with a bunch of people who are low level." (ROA.269.) Given defense counsel's emphasis on the drug quantity at sentencing and the fact that the district court explicitly accounted for that argument in varying downward, the record convincingly demonstrates that the court believed the 120-month sentence was appropriate and would not impose a lower sentence on remand. *See, e.g.*, *United States v. Martinez*, 131 F.4th 294, 323 (5th Cir. 2025); *United States v. Stephens*, 844 F. App'x 723, 724 (5th Cir. 2021) (any error in the drug-

quantity calculation was harmless where the court was clear in its reasons for a downward variance).

Additionally, the district court stated that, although it had consulted with the guidelines, "setting aside" the guidelines, its chosen sentence was appropriate based on the Section 3553(a) factors. (ROA.270.) Then, in a written statement of reasons, the court explicitly stated that, "[e]ven if the guideline calculations are not correct, this is the sentence the Court would otherwise impose under 18 U.S.C. § 3553." (Dkt. No. 92 at 4.) These statements demonstrate that the court believed that the 120-month (i.e., a round number of ten years) sentence was warranted based on the statutory sentencing factors. *See, e.g.*, *United States v. Hott*, 866 F.3d 618, 621 (5th Cir. 2017) ("tak[ing] the district court at its clear and plain word" in the written statement of reasons that it would have imposed the same sentence even if the guidelines calculations were incorrect (internal quotation marks omitted)). The court's clear statements, combined with the court's stated reasons for imposing the downward variance, demonstrate that any error was harmless. *See, e.g.*, *United States v. Reed*, No. 25-10319, 2025 WL 2992421, at *1 (5th Cir. Nov. 24, 2025) (unpublished) (finding that any error in the guidelines

calculation was harmless given the district court's consideration of the Section 3553(a) factors and statement in the written statement of reasons).

In addition to arguing that the Court should disregard the written statement of reasons in its harmlessness analysis, Lara also says the Court should "vacate" the disclaimer for a litany of additional reasons—that it: violates the public's right of open access to the courts; violates the defendant's right to be present at sentencing; and allows the district court to "unilaterally opt out of appellate review" of guidelines errors. (Brief at 31-46.) None of this is true. "[B]inding circuit precedent has already blessed considering such statements," *United States v. Sealed Appellant*, No. 24-30570, 2025 WL 1924524, at *3 n.2 (5th Cir. July 14, 2025) (citing *Hott*, 866 F.3d at 621), and the Court should reject Lara's invitation to upend its caselaw relying on such statements as evidence supporting harmless error, *see, e.g.*, *United States v. Ahmadou*, 159 F.4th 936, 950-51 (5th Cir. 2025) ("Here, [the government has met its] burden to show [harmlessness] because the written statement of reasons confirms that the district court would have imposed the same sentence for the same reasons under § 3553(a)."); *United States v. Coto-Mendoza*, 986 F.3d 583, 587 (5th Cir. 2021) (noting that the disclaimer in the written statement of reasons

"[i]ndicat[ed] that [the sentencing court] gave some thought" to the appropriate sentence).

Further, Lara—like all defendants—was present at his sentencing, where the court pronounced all of the terms of his sentence and confirmed that the Section 3553(a) factors supported that chosen sentence. The court's statement that, "[e]ven if the guideline calculations are not correct, this is the sentence the Court would otherwise impose under 18 U.S.C. § 3553" did not conflict with anything said at sentencing or add any additional terms to the sentence. Instead, it simply provides additional support for what the district court already said—that it believed the chosen sentence was appropriate under the Section 3553(a) factors, regardless of the guidelines range. *See Sealed Appellant*, 2025 WL 1924524, at *3 n.2 (rejecting a similar argument and confirming that this Court can consider the sentencing court's explanation for the sentence in the written statement of reasons).

Finally, contrary to Lara's argument that the written statement of reasons hinders meaningful appellate review, it does the opposite. Without taking the district court "at its clear and plain word" that it would impose the same sentence regardless of the guidelines, this Court would "risk . . . a remand that would be 'an exercise in futility in order to obtain the same sentence.'" *Id.* (quoting *United States v. Martinez-Rivera*, No. 24-20031, 2025

WL 985711, at *3 (5th Cir. Apr. 2, 2025)); *see also United States v. Rios*, 584 F. App'x 275, 276 (5th Cir. 2014) (noting that the district's statement that it "would have imposed the same sentence regardless of" any error in the guidelines range in the statement of reasons allowed for appellate review of the court's reasoning). The Court should affirm.

## CONCLUSION

This Court should affirm the judgment.

Respectfully submitted,

Ryan Raybould
United States Attorney

*/s/ Lindsey D. Pryor*
Lindsey D. Pryor
Assistant United States Attorney
Texas State Bar No. 24099182
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8822
lindsey.pryor@usdoj.gov

Attorneys for Appellee

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,697 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*/s/ Lindsey D. Pryor*
Lindsey D. Pryor